Filing # 27151296 E-Filed 05/11/2015 05:32:25 PM

IN THE CIRCUIT COURT IN AND FOR THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

BANKUNITED, N.A., a National Bank,
as Administrative agent,

        Plaintiff,

CASE NO. _____

vs.

MILLIMAN, INC., a Washington Corporation,

        Defendant.

_____/

## COMPLAINT

Plaintiff, BANKUNITED, N.A., a National Bank, as Administrative Agent to a lender group comprised of Capital Bank, Mercantil Commercebank, Israeli Discount Bank, and BCI Miami (**"Plaintiff"**), sues Defendant, MILLIMAN, INC., a Washington corporation (**"Defendant"**), and states as follows:

### JURISDICTION AND VENUE

1.     Plaintiff is a National Bank with its principal place of business in Miami-Dade County, Florida, doing business in Hillsborough County, Florida, and is otherwise *sui juris*.

2.     Defendant is a Washington corporation, doing business in Hillsborough County, Florida, and is otherwise *sui juris*.

3.     Plaintiff seeks damages against Defendant in an amount in excess of $15,000.00 exclusive of attorney's fees and costs, and therefore, jurisdiction is properly laid in this Court.

4.     All causes of action accrued in Hillsborough County, so venue is proper in this Court.

00321949.DOCX

5.     All conditions precedent to the filing of this lawsuit have occurred, been satisfied, or have been waived.

## GENERAL ALLEGATIONS SUPPORTING THE CLAIMS

6.     In 2012, Plaintiff entered into a $60 million lending facility with Universal Health Care Group, Inc., a Delaware corporation ("**UHG**") pursuant to a Credit Agreement, dated April 6, 2012 (the "**Credit Agreement**" or the "**Loan**"), which was guaranteed by one of UHG's subsidiaries, American Managed Care, LLC, a Florida limited liability company ("**AMC**").

7.     UHG was the corporate parent to, among others, two Florida insurance companies, Universal Health Care Insurance Company, Inc. ("**UHCIC**") and Universal Health Care, Inc. ("**UHC**").  UHC and UHCIC were required to make regulatory filings, and to have an actuary opine on the sufficiency of the information contained in those regulatory filings along with information contained in the consolidated financial statements of UHG, and in connection with the Medicare bid process. Defendant was the actuary retained to perform these services.

8.     In determining whether to approve the Loan, Plaintiff performed due diligence reviewing business and financial information of UHG, UHC and UHCIC.   Among the information reviewed and relied upon were Defendant's certified actuarial opinions and projections for UHC and UHCIC, which showed that the companies were solvent and on good financial footing as of 2011.  In reality and unknown to Plaintiff, UHC's and UHCIC's statutory reserves and projections were grossly misstated, and their outstanding medical claims were grossly understated for 2011.  Indeed, rather than a significant multi-million dollar profit, UHC and UHCIC actually experienced a loss of tens of millions of dollars.

9.     Defendant knew that third-parties, including Plaintiff, the Office of Insurance Regulation ("**OIR**") and the Centers for Medicare and Medicaid Services ("**CMS**") would rely

on the actuarial work that it did for UHG and its subsidiaries, and therefore had an obligation to ensure that the information in the statements of actuarial opinion that Defendant issued accurately portrayed the financial condition of UHG and the regulated entities.

10.     Defendant failed to meet its obligations.  Defendant incorrectly certified that the regulated entities had adequate reserves to fund outstanding claims incurred but that were not reported ("**IBNR claims**") giving UHG and the regulated entities the appearance of solvency, when, in fact, those reserves were inadequate.

11.     By this lawsuit, Plaintiff seeks to recover damages from Defendant, in an amount in excess of $30 million, as a result of Defendant's negligent misrepresentations regarding the finances of the regulated entities, breaches of its obligations under applicable actuarial guidelines, and aiding and abetting misrepresentations by the former officers and directors of UHG and its subsidiaries (including AMC).

A.     **The UHG Entities**

**UHG**

12.     UHG was a holding company controlling 100% of the stock of certain government-regulated entities, including UHCIC, and three active health maintenance organizations that provided managed care services for government sponsored health care programs, focusing on Medicare and Medicaid.

13.     UHG was a Delaware corporation that was headquartered in St. Petersburg, Florida. It was formed in 2006 as a holding company to provide a number of health insurance and managed care products through its wholly-owned subsidiaries.

14.     UHG's majority shareholders were Desai Limited Partnership (holding a 56.66% interest in UHG) and Dr. Akshay K. Desai (holding 23.32% interest in UHG). The remaining shareholders acquired fractional ownership through a private offering in 2007.

15.     UHG's officers and directors included Dr. Akshay M. Desai, Sandip I. Patel, Jeff Ludy, Seema Desai, and Deepak Desai.

16.     The health management organizations under UHG's umbrella were: UHC, Universal HMO of Texas, Inc., a Texas corporation ("**Universal Texas**"), and Universal Health Care of Nevada, Inc., a Nevada corporation ("**Universal Nevada**"). (UHC, Universal Texas and Universal Nevada will be referred to as the "**HMOs**"). A non-operating HMO, Universal Health Care of Georgia, Inc., a Georgia corporation ("**Universal Georgia**"), was also a wholly-owned subsidiary.

17.     UHG also owned AMC, a management company and third party administrator for UHCIC, UHC, Universal Texas, and Universal Nevada.

18.     UHCIC and the HMOs, as insurance entities, were regulated by the states in which they did business (the "**Regulated Entities**"). As part of the governmental oversight of the Regulated Entities, they were required to submit regulatory filings to their respective states on a quarterly and annual basis, which must be reviewed and certified by an actuary, to ensure that their reserves were sufficient to pay out both existing and reported claims, and IBNR claims.

19.     UHG and the Regulated Entities retained Defendant. Stuart D. Rachlin, F.S.A., M.A.A.A. ("**Rachlin**"), a principal and consulting actuary with Defendant, was the primary actuary assigned to the Regulated Entities.

20.     Mr. Rachlin reviewed and signed off on the regulatory filings that the Regulated Entities filed with the OIR.

21.     The regulatory filings, and reserve numbers that Mr. Rachlin signed off on, were ultimately included in financial statements that were provided to UHG's auditor, Ernst & Young ("E&Y"), for inclusion in audited consolidated financial statements issued for UHG and its subsidiaries.  These consolidated financial statements reflected the overall health of UHG, based on the health of its subsidiaries, including the Regulated Entities.

22.     The previous years' audits, and draft audits based on Defendant's statements of actuarial opinion and the regulatory filings, showed that UHG and the Regulated Entities were solvent.

23.     As discussed herein, Plaintiff relied on this fact when deciding whether to enter into the Loan, and later whether or not to allow additional funding, or to call a default and take measures to preserve the value of UHG's assets to cover, at minimum, the amounts then due and owing to Plaintiff.

24.     In fact, the information in the financial statement relating to IBNR claims was grossly understated, giving UHG the appearance of profitability when, in fact, its pre-tax losses totaled over $46 million, and UHC and UHCIC actually fell well-below the threshold for their required regulatory capital levels.

**AMC**

25.     AMC was formed as a third-party administrator in 2002 to provide utilization management, provider service and credentialing, claims enrollment and billing, customer service, accounting and management information systems. Its only clients were the Regulated Entities.

26.     AMC was a wholly-owned subsidiary of UHG and was the guarantor for the Loan.  AMC employed the corporate officers and the majority of the employees of UHC and UHCIC.

**UHC**

27.     UHC had contracts with the Department of Health and Human Services ("**DHS**"), and CMS to provide health care services to Medicare enrollees in various counties in Florida.

28.     UHC also had contracts with the Agency for Healthcare Administration and the Florida Department of Elder Affairs to provide health care services to Medicaid and Diversion program enrollees in various counties in Florida.

29.     In 2011, UHC's officers and directors were Dr. Akshay M. Desai, Sandip Patel, James O'Drobniak, and Steve Schaefer.

30.     As of May 2, 2012, the officers and directors of UHC were Dr. Akshay M. Desai, Sandip Patel, and Steve Schaefer.

**UHCIC**

31.     UHCIC was formed as a life and health insurance company by Dr. Akshay M. Desai in 2006 and commenced revenue generating activities in 2007 for the purpose of operating Medicare private fee-for-service plans, and it became one of Florida's largest insurers.

32.     UHCIC had a contract with CMS to provide health care services to Medicare enrollees.

33.     In 2011, UHCIC's officers and directors were Dr. Akshay M. Desai, Sandip Patel, James O'Drobniak, and Steve Schaefer.

34.     As of December 31, 2012, UHCIC's officers and directors were Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, Steve Schaefer, Jeff Ludy, and Michael Holohan.

35.     UHCIC's directors or trustees included Dr. Akshay M. Desai, Deepak Desai, Seema Desai, Jayendra Choski, and Sandip Patel.

36.     In or around 2007, UHCIC introduced the "Any, Any, Any Plan," in which members purportedly could see any doctor, anywhere, at any time. Thousands of customers enrolled, but the company temporarily suspended enrollment, because of complaints of false advertising, poor customer service, and denial of medical treatment.

37.     In 2008, UHCIC entered into an agreement with state regulators to increase its reserves to handle the swelling volume of claims. Over the next few years, UHG and its Regulated Entities expanded to serve 23 states and the District of Columbia, and approximately 150,000 members. Despite its growth, complaints of poor service dogged UHCIC from 2010 onward, and Medicare officials urged potential members to use caution before enrolling.

38.     Nevertheless, through 2010 and 2011, UHG and its subsidiaries experienced significant growth in the Medicare insurance market.

**B.    Underwriting the BankUnited Loan**

39.     In February 2011, UHG secured financing with Wells Fargo Bank, borrowing $37.5 million.

40.     In 2012, UHG approached Plaintiff for a structured $50 million revolving Line of Credit with a lender group to pay off the loan with Wells Fargo.

41.     Plaintiff's representatives met with prospective participant banks in St. Petersburg, Florida. The representative banks and their proposed initial funding were: Capital Bank ($15 million), Mercantil Commercebank ($7 million), Israeli Discount Bank ($6.5 million) and BCI Miami ($6.5 million). As a result of the level of interest in participation of the representative banks, the participant banks increased their funding proportionate to their initial funding proposals, and Plaintiff increased the amount of the Line of Credit to $60 million.

00321949 DOCX

7

42.     The Loan was underwritten based on receipt of audited consolidated financial statements for UHG for the fiscal year end periods of 12/31/2009-12/31/2010, and internally prepared fiscal year end statements including detailed notes thereto dated 12/31/2011 as certified by UHG's management.

43.     UHG's management-prepared consolidated income statement, provided to Plaintiff showed that by the end of 2011, UHG and all of its subsidiaries still had a pre-tax net income of $24,090,487.

44.     In determining whether to fund the Loan, Plaintiff noted that UHG was the holding company for the Regulated Entities, whose state insurance departments required that the Regulated Entities maintain minimum levels of statutory capital, and any withdrawal of that capital to the parent company required the approval of regulators.

45.     Plaintiff noted that the Regulated Entities appeared to be well within compliance with minimum statutory capital requirements.

46.     Plaintiff also noted that as to the Florida regulated entities, their regulatory capital was determined independently by the State of Florida and subject to outside audit by several state entities and sub-contractors on an ongoing basis.

47.     On about March 22, 2012, UHG provided Plaintiff with a draft set of audited consolidated financial statements for UHG for the fiscal year ending on December 31, 2011 (the "Draft Audit"), with the notes to the Draft Audit suggesting that the medical claims payable amount was actuarially based on historical claims payment experience, current enrollment, member statistics, and other statistics.

48.     Plaintiff relied, in part, on the Draft Audit in underwriting the Loan.

49.     The Draft Audit showed that for 2011, the accrued loss adjustment expense for claims decreased by approximately $24,935,000 from prior years, ultimately showing that outstanding IBNR claims that were payable amounted to $128,354,077.

50.     The Draft Audit included actuarial information received from Defendant, and considering all of the possible claims, showed that as of December 31, 2011, UHG and its subsidiaries, including the Regulated Entities, had a net income of $10,761,982.

51.     Ultimately this was completely untrue; as of December 31, 2011, UHG, the Regulated Entities, and its subsidiaries produced a deficit of $29,002,958.  This fact, however, would not be discovered until E&Y issued its final audited consolidated financial statements for UHG on July 31, 2012, well after the Loan had closed and the initial funding advanced.

52.     Had Defendant correctly qualified its opinions, and its subsequent amended opinions, the OIR or CMS would have taken action prior to Plaintiff approving the Loan, it never would have closed, and Plaintiff would not have advanced funds it may never recover.

**C.     <u>BankUnited Approves the Loan</u>**

53.     When Plaintiff funded the Loan, it did not have the benefit of the financial information that came to light in the late summer of 2012.

54.     Thus, when it approved the Loan, Plaintiff relied on the Draft Audit, the unaudited financial statements for 2011, UHG's Consolidating Income Statement for the twelve months ended December 31, 2011, UHG's Consolidating Income Statement (ceded) for the twelve months ended December 31, 2011, UHG's Consolidating Balance Sheet for December 31, 2011, UHG's Consolidating Balance Sheet for December 31, 2011 (ceded), UHG's Consolidating Income Statement for the Three Months Ended March 31, 2012 and the fact that there was no regulatory action against UHG and the Regulated Entities.  The Draft Audit

included UHG's profitability for 2010, and based on Plaintiff's involvement in previous discussions involving refinancing the Wells Fargo loan, it was also in possession of, and did review and consider UHG's audited consolidated financial statements for the years ended December 31, 2009 and December 31, 2010.

55.     On April 6, 2012, Plaintiff entered into the Credit Agreement with UHG as the borrower and AMC as the guarantor.

56.     The Credit Agreement was signed by Sandip Patel on behalf UHG and Dr. Akshay M. Desai on behalf of AMC.

57.     At Section 3.1 of the Credit Agreement, UHG and AMC represented and warranted, among other things, that the unaudited financial statements they had delivered fairly presented in all material respects the financial condition of UHG including the Regulated Entities.

58.     At Section 3.2 of the Credit Agreement, UHG and AMC represented and warranted, among other things, that since December 31, 2011, there had been no development or event which had or reasonably could be expected to have a material adverse effect on the business, operations, assets or condition (financial or otherwise) of UHG including the Regulated Entities.

59.     On or about April 6, 2012, the representations and warranties made on behalf of UHG and AMC at Sections 3.1 and 3.2 of the Credit Agreement were untrue.

60.     On or about April 6, 2012, Dr. Akshay M. Desai knew or should have known that the representations and warranties made on behalf of UHG and AMC at Sections 3.1 and 3.2 of the Credit Agreement were untrue.

61.     On or about April 6, 2012, Sandip Patel knew or should have known that the representations and warranties made on behalf of UHG and AMC at Sections 3.1 and 3.2 of the Credit Agreement were untrue.

62.     At the closing of the Credit Agreement, on or about April 6, 2012, UHG made a draw on the Loan in the total amount of approximately $30 million, which was partially used to pay off the outstanding balance ($27,520,295) of the debt owed to Wells Fargo, and which included an additional $2,000,000 to be held in a restricted account of UHG as required by its credit agreement with Plaintiff.

63.     In June 2012, BankUnited advanced UHG approximately $8 million under the Loan.

64.     On July 31, 2012, Audited Consolidated Financial Statements for Years Ended December 31, 2011 and 2010 ("Audited Financials") were issued for UHG and its subsidiaries.

65.     The Audited Financials showed numerous material and significant changes compared to the Draft Financials that UHG had provided to Plaintiff when seeking the Loan, including:

        a.      The Draft Financials reflected medical claims payable totaling $128,354,077 for 2011, compared with a total of $180,008,155 reported in the Audited Financials; a difference of $51,654,078.

        b.      The Draft Financials reflected an income from operations of $26,072,178 for 2011, compared with an operating loss of $43,898,539 reported in the Audited Financials; a difference of $69,970,317.

c.     The Draft Financials reflected a total income before income taxes of $16,044,851 for 2011, compared with a loss before income taxes of $46,168,814 reported in the Audited Financials; a difference of $62,213,665.

66.     UHG's Audited Financials showed that UHG was, in fact, hopelessly insolvent.

67.     UHC's statement of actuarial opinion for December 31, 2011, which had been revised in April 2012, was once again revised by Defendant on August 24, 2012. This opinion showed that claims unpaid jumped from $67,472,035 in March 2012, to $83,615,540 when the statement was revised in August 2012.  Nevertheless, this opinion made the same representations as the prior opinions including the representation that there were no material changes from the date of the annual filing statement that should be considered in reviewing the opinion.

68.     UHCIC'S statement of actuarial opinion for December 31, 2012, which was issued on May 30, 2012 showed that claims unpaid as of December 31, 2011 totaled $26,082,000.   This statement was revised by Defendant on September 7, 2012 to show that the claims unpaid as of December 31, 2011 totaled $59,043,000.  Nevertheless, this opinion also stated that it included appropriate provision for all actual items that ought to be established, and that it made a good and sufficient provision for all unpaid claims and other actuarial liabilities, and that the balance sheet met the requirements of the insurance laws and regulations of the state of Florida and were at least as great as the minimum aggregate amounts required by Florida, and that to the best of Rachlin's knowledge, there were no changes from the applicable date of the annual financial statement to the rendering of the opinion that should be considered in reviewing the opinion.

69.     These representations were false.

70.     Defendant's estimation and certification of the IBNR claims for UHCIC and UHC in the original to the amended statutory filings were substantially lower than they should have been, resulting in an increase of claims incurred but not reported of approximately $50 million.

**D.     Milliman and the Actuarial Standards of Practice**

71.     At all times material hereto, Defendant was the actuarial firm for the Regulated Entities.  As such, Defendant was charged with reviewing and analyzing the relevant actuarial data, estimating claims, and certifying that the data submitted to the relevant regulatory authorities was correct and governed by sound actuarial principles.

72.     Given Defendant's intimate knowledge of the financial condition of the Regulated Entities, Defendant also knew that UHG would have to seek additional capital and would need to submit its financial statements (which Milliman's work would factor into) to do so.

73.     Upon information and belief, Defendant was aware prior to the inception of the Loan that Plaintiff was considering entering into a lending facility with UHG, and that Plaintiff would review and rely upon the soundness of the financial condition of UHG and the Regulated Entities before rendering a decision.

74.     Actuaries are governed by various actuarial standards of practice ("ASOP"), promulgated by the Actuarial Standards Board, which establish guidelines under which actuaries are to practice.

75.     Below is a non-exhaustive list of certain of the ASOPs that governed Defendant's relationship with the Regulated Entities, with which Defendant failed to comply:

- ASOP 5, Section 3.1 states that the estimation of incurred health and disability claims is fundamental to the practice of health actuaries, and is necessary for completion of

financial statements and projection of trends, for the analysis or development of rates, and for the development of various management reports.

- ASOP 5, Section 3.2.3 states that an actuary should consider how an organization's claims administration practices may cause fluctuations in the rates of completion lag factors, and how administration practices can be influenced by staffing levels, process and investigation time for complicated claims, computer system challenges or downtime, seasonal backlogs of claims submitted, and cash flow considerations.

- ASOP 5 Section 3.2.4 states that the actuary should consider how marketing, underwriting and business practices of the insurance company can influence the types of risks accepted, and that a pattern of growth of a block of business can influence incurred claims.

- ASOP 5 Section 3.3.1(c) states that the determination of liabilities for incurred but unpaid health and disability claims is an estimate, but that the actuary should consider what margin for uncertainty, if any, is appropriate to be included in the claims estimate.

- ASOP 5 Section 3.4 states that the expansion of health benefit coverages and the greater variety of organizations offering or administering health benefit coverages may increase the type, precision, and the data required by the actuary, and the actuary should make appropriate efforts to obtain accurate data to determine incurred claims.

- ASOP 5 Section 3.5 states that the actuary should consider more than one method for estimating incurred claims and the results obtained in light of the credibility of the data.

- ASOP 23, Section 3.1 notes that data that is completely accurate and comprehensive is frequently not available, but notes that the actuary should use data that in the actuary's professional judgment would allow the actuary to perform the desired analysis.   If

material limitations are known to the actuary, the actuary should disclose those limitations and their implications in its report.

- ASOP 23 Section 3.4 states that an actuary may rely on information supplied by another unless it is or becomes apparent during the time of the assignment that the information contains material errors or is otherwise unreliable.

- ASOP 23 Section 3.7 states that even though completely accurate and comprehensive data are frequently not available, and even though the actuary is not required to audit data or determine whether data is falsified or intentionally misleading, if the actuary believes that the data are likely to contain material defects, it should determine the nature and extent of any verification that may have been performed, and should either arrange for a more extensive review prior to completing the assignment, or if the data are so inadequate that they cannot be used to satisfy the purpose of the analysis, then the actuary should obtain different data, or decline to complete the assignment.

- ASOP 23, Section 3.8 states that the actuary's documentation should include a description of any material defects that the actuary believes are in the data, and adjustments or modifications made to the data, including the rationale for such adjustments or modifications.

- ASOP 23 Section 4.1 states that the actuary should disclose the sources of the data, whether it reviewed the data, any material judgment or adjustments or assumptions that the actuary applied to the data, any limitation on the use of the actuarial work product due to uncertainty about the quality of the data, any unresolved concerns the actuary may have about the data that could have a material effect on the work product, and the

existence of results that are highly uncertain or have a potentially material bias of which the actuary is aware due to the quality of the data, and the magnitude of that bias.

- ASOP 28 Section 3.4 states that the actuary should identify the stated basis of liability and asset presentation, which is a description of the nature of the amounts usually found in the financial statement and the associated footnotes and disclosures, which often depends on regulatory or accounting requirements. It includes, as appropriate, "...whether the amounts are **gross or net of specified recoverables, such as ceded reinsurance or salvage and subrogation,** and follow any requirements for the treatment of these amounts specified by a particular accounting method, and... **types of loss adjustment expenses covered.**" **(emphasis added).**

- ASOP 28, Section 3.5 states that the actuary should identify the scope of the analysis on which its opinion is based including the date of the data that underlies the analysis, the date of the analysis, to the extent it differs from the date of the opinion, and any other items that in the actuary's professional judgment are needed to sufficiently describe the scope of the analysis.

- ASOP 28, Section 3.6 states that the actuary should understand which financial values are usually important to the intended users of the statement of the actuarial opinion, and how those values are likely to be affected by changes in the liabilities and assets. "For example, for a statement of actuarial opinion for an insurance company that is to be used for financial reporting to insurance regulators, materiality might be evaluated **in terms of the company's reported liabilities or statutory surplus**" **(emphasis added).**

- ASOP 28, Section 3.7 states that when an actuary opines that the liabilities make good and sufficient provision for claims, the actuary should include a provision for adverse deviation.

- ASOP 28, Section 3.7.2 states that an actuary may make use of another's analyses or opinions, but should only do so when in the actuary's opinion, it is reasonable to do so. The actuary should consider the amounts of the liabilities or assets covered by the others' analyses or opinions in comparison to the total assets or liabilities, how reasonably deviations may affect the actuary's opinion on the total liabilities and assets, and the credentials of the other individuals that prepared the analyses or opinions. Where, in the opinion of the actuary, those analyses or opinions need to be expanded, the actuary should perform additional analyses as necessary to render an opinion. If the actuary reaches conclusions materially different from those in others' work, the actuary should, when practical, discuss the differences, and if understanding does not result in a resolution, the actuary should take this into consideration when forming an overall opinion.

- ASOP 28, Section 3.9 states that the actuary should consider whether there are significant risks and uncertainties that could result in future paid amounts being materially greater than those provided for in the liabilities or future amounts received being materially less than those provided for. **In general, when establishing a provision for adverse deviation, the provision should increase as the level of uncertainty increases (emphasis added).**

- ASOP 28 Section 3.13 states that the actuary should consider the intended purpose of the statement of actuarial opinion when documenting work. When the statement is provided

to meet regulatory requirements, the actuary should follow the detailed requirements specified by regulators as to the form and content of supporting reports and documentation. Further, that documentation, **"should provide sufficient detail to allow another qualified actuary to understand and evaluate the methods and analyses of the opining actuary" (emphasis added)**.

- ASOP 41, Section 3.4.1 states that the actuary should consider what cautions regarding possible risk of uncertainty of any results should be included in the actuarial report.

- ASOP No. 41, Section 4.4 states that if in the actuary's professional judgment, the actuary has deviated materially from the guidance set forth in an ASOP, the actuary may provide an appropriate statement with respect to the nature and effect of such deviation.

- ASOP No. 42, Section 3.1 states that the determination of liabilities is fundamental to the practice of health actuaries, because it is necessary for the completion of financial statements, for the analysis and projection of claim trends, for the analysis or development of premium rates, and for the development of various management reports.

- Section 3.2 of ASOP No. 42 states that when determining liabilities under that section, the actuary should consider whether, among other factors, business practices and environmental factors may materially affect liabilities and claim trends. The section also states that when, in the actuary's professional judgment, a representation from management is an appropriate source of information about a specific item the actuary may rely on that representation.

- ASOP 42, Section 3.2.4 states that the actuary should consider how marketing, underwriting and other business practices can influence the types of risks accepted.

Furthermore, a pattern of growth or contraction and claims administration practices can influence claim rates and trends and therefore impact liabilities.

- ASOP 42, Section 3.9 states that the actuary should consider what margin for uncertainty, if any, would be appropriate.

- ASOP 42, Section 3.11(a) states that when an actuary is preparing an opinion to comply with NAIC Health Annual Statement instructions, the actuary providing an unqualified opinion represents that the reserve amount makes good and sufficient provision for the specified liabilities.  In making this judgment the actuary should be satisfied that the actuarial judgments made give recognition to any relevant factors, including the time periods over which the liabilities will extend.

- ASOP 42, Section 3.11(b) states that when an actuary is preparing an opinion to comply with NAIC Health Annual Statement instructions, the actuary should issue an adverse opinion when the aggregate amount established is not sufficient for the actuary to provide an unqualified opinion – when the liabilities fall outside a reasonable range for the specified purpose, the actuary should provide an adverse opinion.

- ASOP 42 Section 3.11(c) states that the actuary should issue a qualified opinion when, in the actuary's opinion, the liability or asset for certain items are in question because they cannot be reasonably estimated or when the actuary is unable to render an opinion on the liabilities or assets for those items. The actuary is not required to issue a qualified opinion if the actuary reasonably believes that the items in question are not likely to be material.

- ASOP 42, Section 3.13 states that the actuary should consider the intended purpose of the statement of actuarial opinion when documenting the work.  That documentation should

provide sufficient detail to allow another qualified actuary to understand and evaluate the methods and analyses of the opining actuary.

- ASOP 42, Section 4.3(b) and (c) state that if the actuary determines that the liability is understated, the actuary should disclose the minimum amount that the actuary believes is reasonable. If the actuary believes that the liability or asset amount is overstated, the actuary should disclose the maximum amount that the actuary believes is reasonable.

### E.    Defendant Failed to Satisfy Actuarial Standards of Practice

76.    UHCIC and UHC had an obligation to file annual and quarterly reports with the OIR. Those reports were certified by Defendant and Defendant issued statements of actuarial opinion as to whether those filings were in accordance with actuarial principles and made a good and sufficient provision for all unpaid claims and actuarial liabilities of UHCIC and UHC.

77.    Defendant was aware that UHG used its statements of actuarial opinion for the Regulated Entities for regulatory and filing purposes.

78.    Moreover, Defendant knew that the actuarial work and certifications it performed for UHG and the Regulated Entities was reviewed, and used by third-parties, including individuals at the OIR, and that its actuarial determinations were used by E&Y in auditing UHG's and its subsidiaries' consolidated year-end financial statements, and ultimately commenting on UHG's solvency.

79.    Defendant's relationship with UHG and the subsidiaries was of long-enough duration that it knew that UHG's statutory reporting was frequently subject to scrutiny by the OIR and the Department of Financial Services.

80.    Defendant knew that UHCIC was growing exponentially during the year 2011 and that this fact would affect the IBNR claims.

00321949 DOCX

20

81. Therefore, sound actuarial principles would require that in performing actuarial work for the Regulated Entities, Defendant should calculate the IBNR reserves with a higher, wider margin, to account for the uncertainty in the IBNR claims.

82. This fact is not accounted for in the statements of actuarial opinion that Defendant issued for the Regulated Entities and Defendant did not increase the reserves margin for IBNR claims to a level that was reasonable under the circumstances. Defendant failed to provide for excess capital or to make adequate provisions for the IBNR claims.

83. Defendant was also aware that UHG and the Regulated Entities had, in the past, entered into consent orders and corrective action plans with the OIR as a result of their failure to follow claims management and statutory reserves reporting procedures, resulting in deficiencies in statutory reserves.

84. Therefore, although Defendant issued unqualified opinions Defendant did not have a good-faith basis to unquestionably rely on the financial information that UHG and the Regulated Entities provided to it, as that information had proven incorrect and unreliable in the past.

85. Defendant also knew that UHG and the Regulated Entities were experiencing difficulties with their claims reporting system, and were attempting to switch to a more-powerful claims management system in an effort to provide Defendant with more accurate claims data.

86. Defendant was aware of the myriad issues with UHG's and the Regulated Entities' claims reporting, including the fact that UHG's reporting system was flawed, and subject to substantial lags between claims being incurred and claims being reported.

87. Defendant's statements of actuarial opinion do not note these issues as factors that might impact the claims amounts, or the accuracy of the data that Defendant certified.

88.     In this case, as the Regulated Entities had previously been subject to corrective action plans with the OIR, UHC's and UHCIC's management was not an appropriately reliable source of information, and Defendant should have scrutinized any data it received from management to ensure that Defendant was justified in relying on that data.

89.     Because the representations from the Regulated Entities' management were not reasonable and management was not an appropriate source of information, Defendant should not have relied on such representations.

90.     Even as UHG and the Regulated Entities imploded, Defendant continued to amend previously filed statements of actuarial opinion certifying the Regulated Entities' regulatory filings, and failing to qualify its opinions, or give any indication that UHG and its subsidiaries were in dire financial condition.

91.     Defendant had a duty to ensure that its statements of actuarial opinion, including the amount of IBNR claims, were fairly and accurately reported, and it had a duty to ensure that if there were any omissions, misrepresentations, or representations contained in the reports, that Defendant noted those deficiencies or issues, such that a third-party reviewer would be on notice to scrutinize them more carefully.

92.     Instead, Defendant continued to issue unqualified statements of actuarial opinion, even though it should have known that the Regulated Entities' IBNR claims were understated.

93.     For example, on March 24, 2012, before the Loan was funded, Defendant certified a statement of actuarial opinion for UHC for the period ending December 31, 2011, stating that based on financial information provided to it by UHC, the amounts carried on the balance sheets were in accordance with accepted actuarial standards and sound actuarial principles, that the amounts on the balance sheets met the requirements of the insurance laws and

regulations for the state of Florida and were at least as great as the minimum aggregate amounts required by Florida, that the company's balance sheet made a good and sufficient provision for all unpaid claims and other actuarial liabilities, and that the company was actuarially sound.

94.     The March 24, 2012 opinion for UHC showed estimated claims unpaid in the amount of $67,472,035.

95.     On April 2, 2012, Defendant issued an amended statement of actuarial opinion for the period ending December 31, 2011 for UHC based on financial information provided to it by UHC, increasing the amount of the claims unpaid to $69,308,700.  This opinion again stated that the numbers on the balance sheets were in accordance with the actuarial standards consistently applied and fairly stated in accordance with sound actuarial principles, that they met the requirements of the insurance laws and regulations for Florida, that they made a good and sufficient provision for all unpaid claims and other actuarial liabilities, and included appropriate provisions for all actuarial items that ought to be established.  The certificate stated that to the best of Defendant's knowledge, there were no material changes from the date of the annual financial statement to the date of the opinion that should be considered in reviewing the opinion.

96.     Because of the uncertainty in the value of the IBNR claims, Defendant should have calculated the IBNR claims with a wide margin to ensure the adequacy of that estimate, and to ensure that UHCIC and UHC had adequate statutory capital to pay unexpected IBNR claims. Defendant used a margin well below an appropriate level for these calculations.

97.     Based on the level of uncertainty in the claims lag data as a result of the Regulated Entities' growth during 2011, Defendant should have known that the regulatory filings with the OIR were incorrect, and that they ultimately misrepresented the true financial condition of UHC and UHCIC.

00321949.DOCX

23

98.     Nevertheless, Defendant did not qualify its statements of actuarial opinion or insert any language tending to show that the reserves set for IBNR claims were understated.

99.     Plaintiff relied on the accuracy of the regulatory filings certified by Defendant when Plaintiff made the Loan, showing that UHG and its subsidiaries were solvent and financially viable companies.

100.    In reality, UHC and UHCIC, through certain of their former directors and officers, had misrepresented the true financial condition of UHCIC and the HMOs, and Defendant signed off on those misrepresentations.

101.    If Defendant correctly qualified its opinions or calculated the appropriate margin for the IBNR claims, UHC and UHCIC's regulatory filings would have shown that they were not solvent and did not meet statutory capital requirements.

102.    Regulatory filings that accurately portrayed the entities' true financial condition would have triggered action by the OIR which, in turn, would have mandated that UHC and UHCIC take steps to resolve their solvency and inadequate capital issues, and Plaintiff never would have funded the Loan.

F.    **BankUnited Calls a Default**

103.    Plaintiff's risk management department noted the discrepancy between the amounts used in the documents submitted to obtain the Loan, and the numbers in UHG's Audited Financials issued on July 31, 2012.

104.    On August 17, 2012, Richard Tan of the OIR noted that UHC's claims unpaid for 2011 were re-stated to approximately $82 million.  Using its own formula, the OIR expected the claims to be approximately $90 million, but the actual claims unreported was approximately $53.8 million, raising concern that UHC was under-reserved by approximately $36 million.

105.   On September 12, 2012, Plaintiff froze UHG's line of credit, and issued a letter of default to UHG.

106.   On October 29, 2012, Plaintiff issued a notice of default to UHG and AMC, asserting that material misrepresentations had been contained in UHG's unaudited financial statements, resulting in covenant defaults.

107.   On November 14, 2012, Plaintiff issued a supplemental notice of default to UHG and AMC, which (i) provided additional clarification regarding the bases for the events of default identified in the initial notice of default; (ii) identified additional events of default relating to certain misrepresentations and covenant defaults under the Credit Agreement, and (iii) provided notice that all commitments under the Credit Agreement were terminated.

108.   In that supplemental notice of default, Plaintiff noted that the December 31, 2011 audited financial statements provided by UHG on July 31, 2012, "materially differed from the Unaudited Financial Statements provided [to BankUnited] in anticipation of closing by, among other things, indicating a *loss* before income taxes of $46,168,814 (as opposed to a *profit* of $16,044,851) and a *net loss* of $29,002,958 (as opposed to *net income* of $10,761,982)."

109.   The default letter noted that IBNR claims increased by more than $51 million. The supplemental notice addressed UHG's failure to comply with statutory capital requirements at UHCIC as an event of default.

110.   UHG and AMC filed for Chapter 11 bankruptcy protection on or about February 6, 2013.

111.   Even though the sky had been falling in on UHC and UHCIC since at least June 2012, Milliman did not resign as the actuary for UHC and UHCIC until February 18, 2013.  The

stated bases for Milliman's resignation were the same issues present in prior years when clean opinions were issued.

112.     In April 2013, Universal Nevada and Universal Texas were placed into receivership.

**COUNT I – NEGLIGENT MISREPRESENTATION**

113.     Plaintiff reincorporates and restates the allegations contained in paragraphs 1-112 hereof as if expressly stated herein.

114.     Defendant made statements of material fact, showing that UHC and UHCIC were solvent and had made good and sufficient provision for all unpaid claims and other actuarial liabilities of the companies, when, in fact, those statements were false and UHC and UHCIC were insolvent, and could not provide for unpaid claims.

115.     Defendant intended or expected that its representations would induce others to act (or not act) on them, including the Plaintiff.

116.     Defendant made these representations under circumstances wherein it should have known that UHC and UHCIC were insolvent, or financially impaired, but Defendant did not give any indication of that fact in its statements of actuarial opinion, even after it was blatantly obvious from the audited financial statements.

117.     Plaintiff justifiably relied on the false statements in Defendant's actuarial work and the fact that the state regulators that also reviewed the statements of actuarial opinion issued by Defendant were not concerned about the solvency of UHC and UHCIC at the time the Loan funded, based on Defendant's representations.

118.   As a direct and proximate result of Defendant's certifying annual and quarterly reports that were false, and that did not show that UHC and UHCIC were actually statutorily impaired, Plaintiff suffered damages in excess of $30 million dollars.

WHEREFORE, Plaintiff BankUnited demands judgment in its favor and against Milliman for damages, costs, and such other and further relief that this Honorable Court deems just and proper.

**COUNT II – AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**

119.   Plaintiff reincorporates and restates the allegations contained in Paragraphs 1- 112 hereof as if expressly stated herein.

120.   UHG through certain of its former directors and officers, including without limitation, Dr. Akshay M. Desai and Sandip Patel, while believing their statements to be true, misrepresented the financial health of the company and of the IBNR claims against UHC and UHCIC.

121.   The misrepresentations showed that the companies were profitable and solvent when, in fact, they were neither.

122.   Dr. Akshay M. Desai and Sandip Patel created, or directed the creation of inaccurate financial statements and reports which prevented the OIR from investigating its financial health, and induced BankUnited to make the Loan.

123.   Dr. Akshay M. Desai and Sandip Patel provided materially misleading and inaccurate information to Defendant, for the Defendant to approve in state regulatory filings.

124.   Defendant knew that there were serious solvency issues with UHC's and UHCIC's regulatory filings, even going so far as to fill out internal requests for further internal review, because of concerns with solvency issues.

125.   Nevertheless, Defendant certified UHC's and UHCIC's regulatory filings despite the knowledge that there were solvency issues.

126.   Defendant failed to qualify its statement of actuarial opinion even after it was clear that the companies were insolvent.

127.   Defendant knew or should have known that UHG and the Regulated Entities were filing incorrect financial statements and providing the same to the OIR and other third parties, including Plaintiff, which materially misrepresented the true financial condition of the companies.

128.   Defendant's actions or inactions, as the case may be, substantially assisted the directors and officers of UHG and the Regulated Entities to negligently misstate the financial health of the companies by failing to qualify its opinions or include qualifying language in the statements of actuarial opinion for UHC's and UHCIC's original or amended statutory filings.

129.   If Defendant had qualified its opinions, or raised red flags early in 2012 as it finalized the year-end work for 2011 in its statements of actuarial opinion, the OIR would have scrutinized UHC and UHCIC and would have determined that when Plaintiff was underwriting the Loan, UHG's regulated subsidiaries were insolvent.

130.   Had Plaintiff known that the regulated subsidiaries were insolvent it would not have closed or funded the Loan.

131.   As a result of Defendant's aiding and abetting the negligent misrepresentations made by the directors and officers of UHG, UHC and UHCIC, Defendant enabled the companies to appear profitable and solvent when they were not.

132.   As a direct and proximate result of Defendant's aiding and abetting these negligent misrepresentations, Plaintiff suffered damages in excess of $30 million.

WHEREFORE, Plaintiff BankUnited demands judgment in its favor and against Milliman for damages, costs, and such other and further relief that this Honorable Court deems just and proper.

## COUNT III – AIDING AND ABETTING INTENTIONAL MISREPRESENTATION

133.    Plaintiff reincorporates and restates the allegations contained in Paragraphs 1- 112 hereof as if expressly stated herein.

134.    On January 31, 2013, the OIR through Director, Toma Wilkerson signed an affidavit in which, based on information provided to OIR from UHG, UHCIC and UHC, she determined that the Medicare Risk Adjustment Receivable ("MRA") reported by UHC was inaccurate and showed the company to be much healthier than it actually was.

135.    Ms. Wilkerson determined that UHC's management instructed individuals with UHC to inflate its MRA receivables with no justification, that the MRA accruals were improperly calculated, resulting in their being substantially inflated, and that UHC's management was aware of the issue and did not want it discussed.

136.    Ms. Wilkerson also determined that UHC's MRA receivable was improperly allocated between UHC and UHCIC, causing the actual amount to be greatly misstated, to give UHC an appearance of financial health.

137.    Ms. Wilkerson determined that after UHC filed an actuarial statement indicating that UHC was under-reserved by $35,834,447 as of June 30, 2012, that UHC had subsequently amended its statement creating invalid receivables to give UHC the appearance of health.

138.    On February 3, 2013, the OIR initiated receivership proceedings against UHC and UHCIC, finding that they had materially misstated their financial health, and had reallocated

certain claims and expenditures between UHCIC and the HMOs, in order to make them appear solvent when they were not.

139.    Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, and Roshan Desai prepared the financial documentation that was provided to Defendant, to be incorporated in Defendant's statements of actuarial opinion, and in UHG's and the regulatory filings of the Regulated Entities.

140.    Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, and Roshan Desai knew that the information that they were including in the documentation that was provided to Defendant was false, and would present UHG and the Regulated Entities as solvent when, in fact, they were insolvent.

141.    Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, and Roshan Desai intentionally misrepresented the financial health of UHG and its subsidiaries in regulatory filings with the State of Florida.

142.    Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, and Roshan Desai intended that third-parties, including the OIR and potential lenders, including BankUnited, would rely on the false financial statements and incorrect financial information that they compiled and filed with the State.

143.    Defendant knew or should have known that the financial information that it certified was incorrect.

144.    Defendant's actions or inactions, as the case may be, substantially assisted Dr. Akshay M. Desai, Sandip Patel, Deepak Desai, and Roshan Desai to intentionally misstate the financial health of the companies by failing to qualify its opinions or include qualifying language

in the statements of actuarial opinion for UHC's and UHCIC's original or amended statutory filings.

145.    Had Plaintiff known that UHG and/or the Regulated Entities were insolvent, it would not have closed or funded the Loan.

146.    As a result of Defendant's aiding and abetting the intentional misrepresentations Defendant enabled the companies to appear profitable and solvent when they were not.

147.    As a proximate result of Defendant's aiding and abetting the intentional misrepresentations, Plaintiff suffered damages in excess of $30 million.

WHEREFORE, Plaintiff, BankUnited demands judgment in its favor and against Milliman for damages, costs, and such other and further relief that this Honorable Court deems just and proper.

Dated this 11th day of May, 2015.

Respectfully submitted,

GrayRobinson, P.A.
*Co-Counsel for BankUnited*
401 E. Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301
Telephone: 954.761.8111
Facsimile: 954.761.8112
Frank P. Terzo, Esq.
Florida Bar No. 906263
E-mail: frank.terzo@gray-robinson.com

-and-

BAST AMRON LLP
*Co-Counsel for BankUnited*
SunTrust International Center
One Southeast Third Ave., Suite 1400
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
E-mail: bamron@bastamron.com
E-mail: jkorch@bastamron.com

By:___ */s/ Brett M. Amron*_____
        Brett M. Amron, Esq. (FBN 148342)
        Jeremy S. Korch, Esq. (FBN 0014471)

00321949.DOCX

32